[This opinion has been published in *Ohio Official Reports* at 77 Ohio St.3d 338.]

THE STATE EX REL. PURDY ET AL. *v.* CLERMONT COUNTY BOARD OF
ELECTIONS ET AL.

[Cite as *State ex rel. Purdy v. Clermont Cty. Bd. of Elections*, 1997-Ohio-278.]

*Mandamus action challenging boards of elections' interpretation of R.C.
3513.04—Writ denied, when.*

(No. 96-2067—Submitted and decided October 8, 1996—Opinion announced
January 22, 1997.*)

IN MANDAMUS.

_____

{¶ 1} Relators in this election matter are Virginia M. Purdy and Anita M.
Tighe.  Respondents are the Clermont and Cuyahoga County Boards of Elections.

{¶ 2} Relators became candidates in their districts for nomination for the
offices of state representative, Ohio House of Representatives.  Purdy attempted to
secure the Republican Party nomination for election to the Eighty-Eighth House
District, and Tighe the Democratic Party nomination for election to the Seventieth
House District.  However, both relators were defeated in their March 1996 primary
elections.

{¶ 3} Purdy and Tighe subsequently filed nominating petitions and
statements of candidacy for election to the State Board of Education ("State
Board") for the Tenth District and Fifth District, respectively.  Relators timely filed
their petitions with their boards of elections, seeking to have their petitions certified
and their names placed on the ballots for the November 1996 election.  See R.C.
3513.259.

{¶ 4} Respondent Clermont County Board of Elections received two
written protests challenging Purdy's candidacy, and respondent Cuyahoga County
Board of Elections received one written protest challenging Tighe's candidacy.

*Reporter's Note:  On October 8, 1996, the writ of mandamus sought in this case was denied,
"consistent with the opinion to follow."  77 Ohio St.3d 1404, ___ N.E.2d ___.  The "opinion to
follow" is announced today.

Relying on R.C. 3513.04, respondents sustained the protests and refused to certify the petitions.

{¶ 5} On September 9, 1996, relators filed an original action in mandamus in this court, challenging respondents' interpretation of R.C. 3513.04 and further alleging that any reliance by respondents on the statute in refusing to certify their nominating petitions "is an unconstitutional infringement of Relators' right to ballot access and the right of a voter to vote for a candidate of her choice as guaranteed by the First and Fourteenth Amendments of the Constitution of the United States of America." As relief, relators request that we "(1) issue a Writ of Mandamus commanding Respondents to certify the Relators' candidacies on the November 5, 1996 ballot, (2) issue an alternative writ prohibiting the printing of ballots pending this Court's resolution of this case, and (3) award Relators their costs and attorneys' fees herein expended."

_____

*Benesch, Friedlander, Coplan & Aronoff*, *James F. DeLeone*, *C. David Paragas*, *N. Victor Goodman* and *J. Gregg Haught*, for relators.

*Talikka, Ischie, Talikka, Wilson & Black* and *Neil R. Wilson*, for relator Anita M. Tighe.

*Donald W. White*, Clermont County Prosecuting Attorney, and *Thomas L. Blust*, Assistant Prosecuting Attorney, for respondent Clermont County Board of Elections.

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, *Patrick J. Murphy* and *Michael P. Butler*, Assistant Prosecuting Attorneys, for respondent Cuyahoga County Board of Elections.

_____

**DOUGLAS, J.**

{¶ 6} The issue in this case is whether respondents properly concluded that R.C. 3513.04 barred relators from running for the offices of the State Board in the

2

November 1996 general election. R.C. 3513.04 provides that "[n]o person who seeks party nomination for an office or position at a primary election by declaration of candidacy * * * shall be permitted to become a candidate at the following general election for *any office by nominating petition* or by write-in." (Emphasis added.) R.C. 3513.259 specifies that "[n]ominations of candidates for the office of member of the state board of education shall be made only by *nominating petition*." (Emphasis added.)

{¶ 7} Relators assert that R.C. 3513.04 pertains only to *partisan* elections and, therefore, respondents acted in clear disregard of R.C. 3513.04 by construing the statute to bar their candidacies for election to the State Board. Specifically, relators contend that R.C. 3513.04 should not be interpreted to prohibit unsuccessful candidates in a partisan primary from becoming candidates at the following general election for a nonpartisan office. Pursuant to R.C. 3505.04, individuals seeking election to the State Board are required to be listed on nonpartisan ballots.

{¶ 8} The paramount consideration in construing a statute is legislative intent. *State ex rel. Zonders v. Delaware Cty. Bd. of Elections* (1994), 69 Ohio St.3d 5, 8, 630 N.E.2d 313, 315. " 'In determining legislative intent, the court first looks to the language in the statute and the purpose to be accomplished.' " *Id.*, quoting *State v. S.R.* (1992), 63 Ohio St.3d 590, 594-595, 589 N.E.2d 1319, 1323. "If the meaning of a statute is unambiguous and definite, then it must be applied as written and no further interpretation is appropriate." *State ex rel. Herman v. Klopfleisch* (1995), 72 Ohio St.3d 581, 584, 651 N.E.2d 995, 997.

{¶ 9} Relators contend that the term "any office," as set forth in R.C. 3513.04, pertains only to partisan offices and not nonpartisan offices such as the offices of the State Board. We disagree. "Words used in a statute must be accorded their usual, normal or customary meaning." *State ex rel. Hawkins v. Pickaway Cty. Bd. of Elections* (1996), 75 Ohio St.3d 275, 277, 662 N.E.2d 17, 19; see, also, R.C.

1.42. "Any" means "one or some indiscriminately of whatever kind." Webster's Third New International Dictionary (1971) 97. "Office" means "[a] public charge or employment." Black's Law Dictionary (6 Ed.1990) 1082.

{¶ 10} Clearly, R.C. 3513.04 is not limited to "any *partisan* office," as relators contend. If we were to interpret R.C. 3513.04 in this manner we would be adding language to the statute that simply does not exist. "It is the duty of the court to give effect to the words used and not to insert words not used." *State ex rel. Carter v. Wilkinson* (1994), 70 Ohio St.3d 65, 66, 637 N.E.2d 1, 2. Moreover, relators' position is further undermined by the fact that R.C. 3513.04 has been amended to expand the breadth of the statute from barring unsuccessful primary candidates from running for the "same office" to barring them from running for "any office" at the following general election. See 124 Ohio Laws 673, 678. Indeed, the present version of R.C. 3513.04 contains no special exception for those candidates who run on a nonpartisan ballot. See, *e.g*., 1963 Ohio Atty.Gen.Ops. No. 478, at 491 ("For the purposes of [R.C. 3513.04], the question of whether a candidate runs on a partisan or non-partisan ballot is irrelevant.").

{¶ 11} The language of R.C. 3513.04 is plain and unambiguous and conveys a clear and definite meaning. The statute unequivocally precludes the candidacies of relators for the offices of the State Board with respect to the November election. See, also, 1993 Ohio Atty.Gen.Ops. No. 93-052, at 2-252 ("The language of this portion of R.C. 3513.04 is clear, and does not, therefore, require interpretation."). Thus, we find that respondents properly interpreted R.C. 3513.04 and, accordingly, did not act in clear disregard of the statute in denying certification of relators' nominating petitions.

{¶ 12} Relators also argue, alternatively, that R.C. 3513.04 as interpreted and applied by respondents violates the First and Fourteenth Amendments to the United States Constitution. In particular, relators contend that their constitutional rights as candidates to ballot access and the rights of electors to vote for candidates

of their choice have been improperly restricted by respondents' interpretation of R.C. 3513.04.

{¶ 13} Initially, it is important to observe that although relators seek a writ of mandamus, the effect of the requested relief would be to enjoin respondents from enforcing the clear mandates of R.C. 3513.04 and to obtain a declaratory judgment on the constitutionality of the statute as it is applied to their situations. Normally, if the allegations in a complaint indicate that the real object sought is injunction, the complaint does not state a cause of action for mandamus and must be dismissed for want of jurisdiction. *State ex rel. Thurn v. Cuyahoga Cty. Bd. of Elections* (1995), 72 Ohio St.3d 289, 290, 649 N.E.2d 1205, 1207; *State ex rel. Governor v. Taft* (1994), 71 Ohio St.3d 1, 2-3, 640 N.E.2d 1136, 1137-1138. Relators could seek a declaratory judgment regarding the constitutionality of R.C. 3513.04, provided that they comply with R.C. Chapter 2721. See, specifically, R.C. 2721.03; see, also, R.C. 2721.12; and *Sebastiani v. Youngstown* (1979), 60 Ohio St.2d 166, 14 O.O.3d 405, 398 N.E.2d 558 (Where the constitutionality of an ordinance [or statute] is challenged by declaratory judgment, service of a copy of the proceeding upon the Attorney General is a jurisdictional requirement.).

{¶ 14} Nevertheless, we have also concluded that the constitutionality of a statute may, in certain instances, be challenged by mandamus. *State ex rel. Zupancic v. Limbach* (1991), 58 Ohio St.3d 130, 133, 568 N.E.2d 1206, 1209; see, also, *State ex rel. Brown v. Summit Cty. Bd. of Elections* (1989), 46 Ohio St.3d 166, 545 N.E.2d 1256; and, generally, 1 Antieau, The Practice of Extraordinary Remedies (1987) 313-315, Section 2.20. Indeed, certain election matters may present extraordinary circumstances. In this regard, declaratory judgment might not provide an adequate remedy in the ordinary course of law. *Brown*, 46 Ohio St.3d at 167-168, 545 N.E.2d at 1258; and *Thurn*, 72 Ohio St.3d at 291-292, 649 N.E.2d at 1207-1208, citing *State ex rel. Smart v. McKinley* (1980), 64 Ohio St.2d 5, 6, 18 O.O.3d 128, 129, 412 N.E.2d 393, 394 ("[G]iven the proximity of the

election, an injunction would arguably not constitute an adequate remedy because any 'appellate process would last well past the election.' ").

{¶ 15} In the case at bar, relators would have a clear legal right to have their petitions certified if we determined that R.C. 3513.04 was unconstitutional as applied to their situation. Granted, relators could achieve nearly the same results as a writ of mandamus if they would seek a declaratory judgment coupled with a mandatory injunction. However, given the fact that relators are seeking to have their petitions certified and names placed on the ballots for the upcoming November election, the alternative remedy would not be adequate. *Zupancic, supra*, 58 Ohio St.3d at 134, 568 N.E.2d at 1209. Accordingly, given the circumstances here, we believe it is appropriate to consider the constitutional challenges posed by relators.

{¶ 16} The constitutional rights of candidates and voters "do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter* (1972), 405 U.S. 134, 143, 92 S.Ct. 849, 855-856, 31 L.Ed.2d 92, 99. Election laws that govern the selection and eligibility of candidates inevitably affect an individual's right to vote and to associate with others for political purposes. *Anderson v. Celebrezze* (1983), 460 U.S. 780, 788, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547, 557. Notwithstanding, states are free to adopt comprehensive laws that protect the integrity and reliability of the electoral process. *Id.*

{¶ 17} Relators claim that any election law that limits ballot access for prospective candidates must be analyzed under the most rigorous standard of review. In this regard, relators assert that to pass constitutional scrutiny, R.C. 3513.04 "must advance a compelling state interest and there must be no less restrictive means available for advancing that interest." However, the fact that a state creates barriers that limits the field of candidates from which voters may choose does not *per se* compel close scrutiny. *Bullock*, 405 U.S. at 143, 92 S.Ct. at 856, 31 L.Ed.2d at 100; see, also, *State ex rel. Markulin v. Ashtabula Cty. Bd. of*

6

*Elections* (1992), 65 Ohio St.3d 180, 185, 602 N.E.2d 626, 630 (noting that a four-member plurality of the United States Supreme Court in *Clements v. Fashing* [1982], 457 U.S. 957, 967-968, 102 S.Ct. 2836, 2846, 73 L.Ed.2d 508, 518-519, stated that candidacy is not a fundamental right). In fact, the United States Supreme Court has adopted a modified balancing test in voting and ballot access cases. 3 Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure (2 Ed. Supp. 1996) 89, Section 18.32(e).

{¶ 18} In *Burdick v. Takushi* (1992), 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245, the court, in upholding Hawaii's prohibition on write-in voting, observed:

"Election laws will invariably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.' *Anderson v. Celebrezze*, 460 U.S. 780, 788 [103 S.Ct. 1564, 1570, 75 L.Ed.2d 547, 557] (1983). Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently. * * * Accordingly, the mere fact that a State's system 'creates barriers * * * tending to limit the field of candidates from which voters might choose * * * does not of itself compel close scrutiny.' *Bullock v. Carter*, 405 U.S. 134, 143 [92 S.Ct. 849, 856, 31 L.Ed.2d 92, 100] (1972); *Anderson*, *supra*, at 788 [103 S.Ct., at 1569-1570, 75 L.Ed.2d, at 557]; *McDonald v. Board of Election Comm'rs of Chicago*, 394 U.S. 802 [89 S.Ct. 1404, 22 L.Ed.2d 739] (1969).

"Instead, as the full Court agreed in *Anderson*, 460 U.S., at 788-789 [103 S.Ct., at 1569-1570, 75 L.Ed.2d, at 557-558]; *id*., at 808, 817 [103 S.Ct., at 1580, 1584-1585, 75 L.Ed.2d, at 570, 575-576] (REHNQUIST, J., dissenting), a more

flexible standard applies. A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' *Id*., at 789 [103 S.Ct., at 1570, 75 L.Ed.2d, at 558]; *Tashjian [v. Republican Party of Connecticut], supra* [479 U.S. 208], at 213-214 [107 S.Ct. 544, at 547-549, 93 L.Ed.2d 514, at 522-523 (1986)].

"Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' *Norman v. Reed*, 502 U.S. 279, 289 [112 S.Ct. 698, 705-706, 116 L.Ed.2d 711, 723] (1992). But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. *Anderson*, 460 U.S., at 788 [103 S.Ct., at 1570, 75 L.Ed.2d, at 557]; see also *id*., at 788-789, n. 9 [103 S.Ct., at 1570, 75 L.Ed.2d, at 557-558]." 504 U.S. at 433-434, 112 S.Ct. at 2063-2064, 119 L.Ed.2d at 253-254.

{¶ 19} R.C. 3513.04 does not prevent an individual from securing a position on the ballot for election to the State Board. It does not discriminate between those who are and those who are not affiliated with a party, nor does it create burdensome ballot access requirements. Rather, R.C. 3513.04 simply prohibits individuals who have run in and lost a party primary from submitting nominating petitions, or becoming candidates by write-in, for any other elective office with respect to the upcoming general election.

**{¶ 20}** The effect of R.C. 3513.04 is to require that a candidate make a choice. A candidate can run in a primary election and take the chance of securing a position on the general election ballot. However, if the candidate fails to win the primary election he or she cannot then seek another elective office by way of nominating petition or by write-in. In the case at bar, relators chose to run in the March 1996 primary for the office of state representative. Then, only after they lost their primaries, relators sought to run in the general election for the State Board. Relators were not prevented from becoming candidates for election to the State Board. Certainly, had relators pursued the office of the State Board and never run in their primaries, they could have easily secured positions on the 1996 November ballot. Indeed, any burden imposed by R.C. 3513.04 was born of relators' own failure to identify the public office in which they truly desired to serve. Additionally, although relators are prohibited from having their names placed on the 1996 November ballot, there is nothing to prevent them from running for the State Board in the next election. Therefore, we find that R.C. 3513.04 imposes only a very limited burden on relators and does not unreasonably interfere with the right of voters to have candidates of their choice placed on the ballot.

**{¶ 21}** Some of the important state interests that have been recognized to uphold the constitutionality of various elections provisions are (1) having orderly, fair, and honest elections instead of chaos, (2) maintaining the integrity of the political process by preventing interparty raids and intraparty feuds, (3) maintaining the integrity of various routes to the ballot, (4) avoiding voter confusion, ballot overcrowding, or frivolous candidacies, (5) ensuring that elections are operated equitably and efficiently, (6) preventing candidacies that are prompted by short-range political goals, pique, or personal quarrel, and (7) preventing parties from fielding an independent candidate to capture and bleed off votes in a general election that might otherwise go to another party. See, generally, *U.S. Term Limits, Inc. v. Thornton* (1995), 514 U.S. ___, 115 S.Ct. 1842, 1870, 131 L.Ed.2d 881, 919;

see, also, *Storer v. Brown* (1974), 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714; and *Foster v. Cuyahoga Cty. Bd. of Elections* (1977), 53 Ohio App.2d 213, 7 O.O.3d 282, 373 N.E.2d 1274.

{¶ 22} Ohio has carefully set forth which public offices are subject to partisan primaries and those that call for nonpartisan elections. R.C. 3505.04. However, compliance with R.C. 3505.04 does not necessarily mean that a person who decides to run for a nonpartisan office is not affiliated with a particular party. It is indeed possible that individuals who compete for a particular nonpartisan position, such as the State Board, are actually members of the same party.

{¶ 23} In *Foster*, *supra*, the Court of Appeals for Cuyahoga County held that R.C. 3513.04 was constitutional as applied to defeated primary candidates running for a *different office* in the succeeding general election. In reaching this conclusion, the court of appeals stated:

"A defeated party primary candidate running in a general election by write-in even for a different office with a different electorate can conceivably have the effect of diminishing the general election as a major struggle. There is a strong suggestion that a loser in a party primary is not an independent in terms of political philosophy; party allegiance was demonstrated by candidacy in the primary election. The independent candidacy in the general election of a defeated party primary candidate is suggestive of intraparty feuding. The candidacy of an individual whose political philosophy and voter support is independent of the major parties is not limited by R.C. 3513.04 since this individual would not ordinarily be a candidate in a party primary." (Footnote omitted.) 53 Ohio App.2d at 232, 7 O.O.3d at 292-293, 373 N.E.2d at 1286.

{¶ 24} It is evident that relators' first and foremost desire was to become state representatives. However, relators lost their primaries and then filed nominating petitions seeking reelection to the State Board. Clearly, R.C. 3513.04 was enacted to address this type of situation. A state may enact legislation which

is designed to prevent the possibility of intraparty conflicts, voter confusion, and candidacies prompted by short-range goals. "Legislatures * * * should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Munro v. Socialist Workers Party* (1986), 479 U.S. 189, 195-196, 107 S.Ct. 533, 537-538, 93 L.Ed.2d 499, 506.

{¶ 25} With respect to the situation here, we believe that relators have failed to overcome the presumption of constitutionality afforded R.C. 3513.04. *Burdick*, *supra*, 504 U.S. at 441, 112 S.Ct. at 2067, 119 L.Ed.2d. at 258 ("[W]hen a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights * * * a prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme."). See, also, *State v. Dorso* (1983), 4 Ohio St.3d 60, 61, 4 OBR 150, 151, 446 N.E.2d 449, 450 ("[A]ll legislative enactments enjoy a presumption of constitutionality," and "the courts must apply all presumptions and pertinent rules of construction so as to uphold, if at all possible, a statute or ordinance assailed as unconstitutional."); and *Herman*, 72 Ohio St.3d at 587, 651 N.E.2d at 999, citing *Fabrey v. McDonald Police Dept.* (1994), 70 Ohio St.3d 351, 352, 639 N.E.2d 31, 33 ("Statutes are presumed to be constitutional unless shown beyond a reasonable doubt to violate a constitutional provision.").

{¶ 26} R.C. 3513.04 does not impose an unconstitutional burden upon the First and Fourteenth Amendment rights of relators and voters. Ohio clearly has a legitimate interest in preventing potential conflicts among party members, an interest in preventing the possibility of voter confusion, and an interest in

preventing candidacies that may conceivably be prompted by short-range goals.[1] Ohio's interests outweigh the slight burden the statute places on relators. R.C. 3513.04 imposes a reasonable restriction on candidates who choose to run for public office, and it furthers the integrity of the electoral process.

{¶ 27} Based on the foregoing, we find that respondents did not act in clear disregard of R.C. 3513.04 in denying certification of relators' nominating petitions. Accordingly, relators' requested writ of mandamus is denied.

*Writ denied.*

RESNICK, F.E. SWEENEY and STRATTON, JJ., concur.

MOYER, C.J., PFEIFER and COOK, JJ., dissent.

_____

**MOYER, C.J., dissenting.**

{¶ 28} I respectfully dissent because R.C. 3513.04 is unconstitutional as applied to the relators in their nonpartisan candidacies for the State Board of Education.

{¶ 29} Our citizens, as voters, expect free and fair elections. Open electoral contests are a long tradition in this country. These are basic premises from which our examination of any law regulating elections must proceed. The state may legitimately restrict access to the ballot, but its authority is constrained. See *Bullock v. Carter* (1972), 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92, 100-101; *Am. Party of Texas v. White* (1974), 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744, 760. Balancing the principle of open and free elections with state regulatory interests is reflected in our constitutional law, which tests the propriety of an election law on the extent to which it burdens First and Fourteenth

_____

1. Also, although not pertinent to this case (but a decision this court will soon have to make given the plethora of election cases being filed with us), there is a compelling state interest for the state, the Secretary of State and county boards of elections, to see that elections are conducted in an orderly manner. It may be that after ballots have been printed and, especially, after absentee voting has commenced, questions of inclusion or exclusion of candidates or issues may be too late.

Amendment rights. *Burdick v. Takushi* (1992), 504 U.S. 428, 433-434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245, 253. Because governmental regulations must often yield to freedom in the democratic process, state election laws generally are upheld only if the burden on voting freedom is outweighed by significant or important state interests. When the state imposes burdens on voting by *severely* restricting the First and Fourteenth Amendment rights of voters, the government must narrowly tailor the law to advance a compelling state interest. See *Burdick*, 504 U.S. at 434, 112 S.Ct. at 2063-2064, 119 L.Ed.2d at 253-254. *Anderson v. Celebrezze* (1983), 460 U.S. 780, 788, 103 S.Ct. 1564, 1569-1570, 75 L.Ed.2d 547, 557. See, generally, 3 Rotunda & Nowack, Treatise on Constitutional Law Substance and Procedure (2 Ed.Supp.1996) 88, Section 18.32(a).

{¶ 30} The constitutional deprivation here is simple. Purdy and Tighe sought their parties' nominations for state representative in their legislative districts by filing a petition for candidacy in the primary election. Both lost the primary election. Purdy and Tighe then filed timely petitions to become candidates for reelection as Members of the State Board of Education of Ohio. State Board of Education members are nonpartisan officials. They are not part of the primary election process. Following protests challenging each candidate, the boards of elections in Purdy's and Tighe's counties refused to certify Purdy and Tighe as State Board of Education candidates. The boards concluded that R.C. 3513.04, Ohio's "sore loser" statute, prohibited the candidacies due to their unsuccessful partisan candidacies for state representative in the primary election.

{¶ 31} Clearly, application of the statute burdened Purdy's and Tighe's constitutional rights by prohibiting their candidacies. Yet the state does not cite a single legitimate interest to support its contention that the statute should be applied to candidates seeking election to different, nonpartisan offices. While sore loser statutes are generally constitutional because they further the state's interest in preventing intraparty feuds from spilling over to the general election ballot, *Storer*

*v. Brown* (1974), 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714, the state has no such interest here.  This is a nonpartisan election—for a different office.

{¶ 32} Denying Purdy and Tighe their rights is the unfortunate result of a conclusory application of the law.  Respondents did not address the application of R.C. 3513.04 to nonpartisan offices, nor did they put forth a single state interest which would justify its application in this case.  Rather, the respondents merely stated, "If you wish to run for office such as State School Board, you simply must avoid seeking a party primary office in the spring."

{¶ 33} Surely the majority does not sanction a view that represents such a stark misinterpretation of constitutional law.  To be sure, there are many important state interests that have been recognized to uphold the constitutionality of various election provisions, including ensuring orderly, fair, and honest elections instead of chaos; maintaining the integrity of various routes to the ballot; avoiding voter confusion, ballot overcrowding, or frivolous candidacies; and ensuring that elections are operated equitably and efficiently.  See, generally, *U.S. Term Limits, Inc. v. Thornton* (1995), 514 U.S. ___, ___, 115 S.Ct. 1842, 1870, 131 L.Ed.2d 881, 919.

{¶ 34} None of these interests is sufficient to constitutionally permit the application of R.C. 3513.04 in this case.  The state's interests of conducting orderly, fair elections and maintaining the integrity of various routes to the ballot do not outweigh the constitutional rights at issue here.  There was nothing chaotic about Purdy's and Tighe's candidacies. Purdy and Tighe caused no disruption to the electoral process by filing their candidacies. To the extent any chaos resulted from this dispute, it occurred because the boards of elections unconstitutionally applied a statute designed to regulate partisan contests.  Purdy and Tighe did not cause the boards to impose a burden upon them, as the majority contends.  Nor did the relators' candidacies threaten the integrity of the ballot process.  It does not threaten the integrity of the general election when a person loses a primary election and then

runs for a different, *nonpartisan* office in the same year. Such a candidate may well be an opportunist; he or she may not be completely committed to the office sought. But those are not constitutional questions. They are campaign issues. Whether or not a candidate is committed to the office he or she seeks is precisely the type of issue which voters can decide during the campaign; it represents the essence of our free and fair election system. Placed in the light of constitutional analysis, however, those concerns are marginal and speculative.

**{¶ 35}** Equally absent is the possibility of voter confusion. The electorate is substantially different for the State Board of Education offices than for the state representative positions that Purdy and Tighe sought in the primary. To be sure, a different electorate alone may not resolve the issue of a defeated party primary candidate seeking a different office in the general election. See *Foster v. Cuyahoga Cty. Bd. of Elections* (1977), 53 Ohio App.2d 213, 232, 7 O.O.3d 282, 292, 373 N.E.2d 1274, 1286. Yet when the dispute involves a *nonpartisan* office, which is not part of a primary election scheme, voters are not misled by the presence of a candidate who previously ran in a party primary for a different office.

**{¶ 36}** Nor, obviously, is there any ballot overcrowding here. The boards' decisions to remove Purdy and Tighe left the voters with no true choice, no actual contest between two candidates. Typically, sore loser statutes seek to preserve the general election for major contests, in which voters are presented with clear *choices* that ensure effective governance. See *Storer, 415 U.S.* at 735, 94 S.Ct. at 1281, 39 L.Ed.2d at 726. Yet, application of the statute here actually caused the opposite result.

**{¶ 37}** It further defies prudent constitutional analysis to assert that any intraparty feuding occurred here. This is not a situation where a party primary loser subsequently sought a different *partisan* office via an independent candidacy. See *Foster,* 53 Ohio App.2d at 232, 7 O.O.3d at 292, 373 N.E.2d at 1286. *Foster* held R.C. 3513.04 constitutional when applied to defeated party candidates seeking a

different partisan office. The court there reasoned that "[t]here is a strong suggestion that a loser in a party primary is not an independent in terms of political philosophy; party allegiance was demonstrated by candidacy in the primary election. The independent candidacy in the general election of a defeated party primary candidate is suggestive of intraparty feuding." *Id*. I do not believe that subsequent candidacies in *nonpartisan* elections suggest intraparty feuding. It does not logically follow that when applied to nonpartisan offices, a candidate's "political philosophy" or personal party allegiance suggests intraparty feuding simply because he participated in a primary election. To equate those personal affiliations that closely with political party feuding confuses the two concepts and leads logically to the suggestion that one must always be an "independent" when vying for a nonpartisan office. In addition, voters who declare party status to run in the primary election can now be denied an opportunity to seek a nonpartisan office simply for taking part in the primary election, on the grounds that intraparty feuding supposedly occurs. This goes far beyond the plain meaning of intraparty feuding. Preventing such feuding is clearly not a significant regulatory interest of the state in the case at bar.

{¶ 38} The majority cannot escape those facts, nor can it ignore the policy behind the statute. In enacting sore loser statutes, the state's aim is to ensure that contending forces within the party bring an end to their differences through the primary election. *Storer*, 415 U.S. at 735, 94 S.Ct. at 1281, 39 L.Ed.2d at 727. Since the primary election serves to winnow the field, the sole purpose of sore loser statues is to preserve the general election ballot for the winners of the primary election and for those independents who have qualified separately. The statute most assuredly does not exist to limit avenues to public service by preventing citizens from seeking a nonpartisan office solely because they aspired to a partisan office in an earlier primary election. Yet that is the effect of the majority's decision. At its worst, the majority's result would prevent a first-time participant in our election

16

system who might lose a party primary due to low name recognition or low campaign funds from serving the public on a local level by running for county school board later in the year.

{¶ 39} Unfortunately, the majority sanctions a result that frustrates the accepted public policy, and time-honored tradition, of free and open elections. Indeed, courts require that regulatory election laws be justified by significant state interests because the Constitution compels the preservation of voters' constitutional rights and their expectation of free access to the ballot. Technical interpretations, and subsequent applications, of a regulatory election law cannot override this policy. See *State ex rel. Osborn v. Fairfield Cty. Bd. of Elections*. (1992), 65 Ohio St.3d 194, 196, 602 N.E.2d 636, 638. When we allow the state to apply an election statute in a way that does not serve any constitutionally recognized interest, we have sacrificed our public policy of free and open elections in the name of efficiency. This is the unfortunate, though predictable, outcome when such a statute is unconstitutionally applied by arbitrary means. See, generally, *Bullock, 405 U.S.* at 145, 92 S.Ct. at 857, 31 L.Ed.2d at 100-101.

{¶ 40} R.C. 3513.04 may well be a reasonable nondiscriminatory restriction that does not severely burden voters' fundamental rights. See *Natl. Commt. of U.S. Taxpayers Party v. Garza* (W.D.Tex. 1996), 924 F.Supp. 71, 75. Therefore, the state may not need to advance a compelling state interest here to justify its application. Even so, there is not even a *significant* state interest here which outweighs the burden placed on the First and Fourteenth Amendment rights of the relators and the voters. Accordingly, the respondents acted in clear disregard of the United States Constitution by applying the statute to deny certification of the relators' candidacies. I respectfully dissent.

PFEIFER and COOK, JJ., concur in the foregoing dissenting opinion.

_____

**COOK, J., dissenting.**

{¶ 41} I respectfully dissent. Reasonable, nondiscriminatory restrictions upon voting rights are generally upheld where the state's important regulatory interests justify the restrictions. *Burdick v. Takushi* (1992), 504 U.S. 428, 434, 112 S.Ct. 2059, 2063-2064, 119 L.Ed.2d 245, 254. Relators presented a prima facie case that R.C. 3513.04 was unconstitutional as applied to them by arguing that the significant interests recognized by the United States Supreme Court did not justify the application of R.C. 3513.04 to persons seeking non-partisan offices. Thereafter, the burden rested with the state to demonstrate that either the recognized significant interests or some other interest justified the application of R.C. 3513.04 to relators. In my opinion, the state failed to meet its burden.

_____